UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CHRISTOPHER VANGILE,

     Plaintiff,

v.                                 Case No: 6:15-cv-832-Orl-JSS

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

_____/

## ORDER

     Plaintiff, Christopher Vangile, seeks judicial review of the denial of his claim for disability insurance benefits and supplemental security income.  As the Administrative Law Judge's ("ALJ") decision was based on substantial evidence and employed proper legal standards, the decision is affirmed.

## BACKGROUND

### A.    Procedural Background

     Plaintiff filed applications for disability insurance benefits and supplemental security income benefits on May 29, 2009.  (Tr. 173–183.)  The Commissioner denied Plaintiff's claims. (Tr. 69–72.)  Plaintiff then requested a hearing before an ALJ.  (Tr. 86–89.)  A hearing was set for July 13, 2010 (Tr. 95–99), but the case was dismissed because neither Plaintiff nor his representative attended the hearing.  (Tr. 76–77.)  Upon Plaintiff's request, the Appeals Council vacated the dismissal and remanded to the ALJ for further proceedings.  (Tr. 79–80.)

     On November 4, 2013, the ALJ held a hearing at which Plaintiff appeared and testified. (Tr. 38–62.)  Following the hearing, on December 2, 2013, the ALJ issued an unfavorable decision

finding Plaintiff not disabled and, accordingly, denied Plaintiff's claims for benefits.  (Tr. 23–37.)  Subsequently, Plaintiff requested review from the Appeals Council, which the Appeals Council denied.  (Tr. 7–22.)  Plaintiff then timely filed a complaint with this Court.  (Dkt. 15.)  The case is now ripe for review under 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).

**B.     Factual Background and the ALJ's Decision**

**1.     Factual Background**

Plaintiff, who was born in 1969, claimed disability beginning on June 25, 2009 due to chronic mastoiditis and a perforated eardrum.  (Tr. 30, 171–183, 192.)  Plaintiff has a twelfth grade education and past relevant work experience as a security guard at nightclubs and restaurants and a pizza delivery person.  (Tr. 32, 47–49, 72, 384.)  When Plaintiff was two years old, he was in a car accident in which his skull was fractured, requiring a mastoidectomy to remove dead cells. (Tr. 28, 42, 52, 363–364, 366, 383.)  As a result of his ear surgeries, Plaintiff experiences frequent ear infections.  (Tr. 51–53.)

In June 2009, Dr. Ursula Taylor, an internal medicine consultant, evaluated Plaintiff and prepared an Independent Internal Medicine Evaluation assessing Plaintiff's alleged disability.  (Tr. 383–390.)  Dr. Taylor evaluated Plaintiff's complaint of his "left ear problem."  (Tr. 383.)  Dr. Taylor noted that Plaintiff has occasional discharge from his left ear and that the removal of his left ear drum puts him at risk for infections and causes him frequent nausea, dizziness, and pain. (Tr. 383, 386.)  As to Plaintiff's ear, Dr. Taylor observed that there was no discharge at the time of her examination and that Plaintiff had no hearing in his left ear.  (Tr. 385.)  She concluded that, due to his dizziness and left ear condition, Plaintiff can lift and carry twenty pounds occasionally and ten pounds frequently; can walk six hours out of an eight hour workday, does not need an assistive device, and has no limitations for sitting; can climb, balance, crawl, and pull occasionally;

should not do work requiring exposure to heights or climbing ladders; should only work occasionally on uneven terrain; should avoid extreme temperatures or windy conditions; and lacks hearing in his left hearing, but has good hearing in his right ear.  (Tr. 386–387.)

In July 2009, Dr. K.C. Salkinder, an ear, nose, throat, head, and neck surgeon, examined Plaintiff and provided an opinion to the Disability Determination Service of Los Angeles, California, regarding Plaintiff's complaints about drainage from his left ear, hearing loss, and dizziness.  (Tr. 389–390.)  Plaintiff told Dr. Salkinder that he typically has procedures four times per year to remove wax and other build-up from his left ear.  (Tr. 389.)  Dr. Salkinder noted some build-up in Plaintiff's left ear, but that "[o]verall, the left ear appeared to be dry" and recommended that Plaintiff would benefit from "a close follow-up by his otolaryngologist on a regular basis, three to four times a year," but that, at the time of the examination, Plaintiff "require[d] no further treatment, since no acute ear condition was diagnosed."  (Tr. 389–390.)

In September 2009, Plaintiff established treatment with the University of Southern California Medical Center, during which Plaintiff's left ear was cleaned.  (Tr. 403.)  Plaintiff was examined in October 2009 and "minimal cleaning [of his left ear was] required" because "it was [d]ry."  (Tr. 404.)  In follow-up examinations in December 2009 and March 2010, the examining physician noted that Plaintiff reported intermittent pain, worsening facial paralysis, and an inability to close his eyes, but that Plaintiff's vertigo was improving, the number of ear infections he had was decreasing, and his left ear was dry.  (Tr. 405–407.)  During the March 2010 examination, the treating physician gave Plaintiff referrals regarding a hearing aid and physical therapy for his vertigo and recommended he return in four months for another cleaning.  (Tr. 406–407.)   When Plaintiff returned for a cleaning in August 2010, the treating physician noted that Plaintiff's left ear was dry and "well aerated" and that minimal cleaning was required.  (Tr. 408.)

In June 2011, Plaintiff was admitted to the emergency room for "ear issues" and was prescribed an antibiotic and pain medication.  (Tr. 428–433.)  In November 2011, Plaintiff established care at Brevard Health Alliance, with advanced registered nurse practitioner ("ARNP") Shedrick Shields, during which Plaintiff complained of decreased hearing, earache, ear discharge, and tinnitus, but did not have symptoms of vertigo, dizziness, or headaches.  (Tr. 440.)  After the examination, Plaintiff's hearing was found to be "grossly intact" and there was "no ear canal drainage or erythema noted."  (Tr. 440.)  In December 2011, Plaintiff returned to ARNP Shields who noted that Plaintiff had "been working out and has lost a few pounds," had made an appointment at an ear, nose, and throat specialist, and was compliant with his medications and diet.  (Tr. 447.)  Plaintiff complained of earache and decreased hearing, but did not have ear discharge, tinnitus, nausea, or vomiting.  (Tr. 447.)  ARNP Shields noted that Plaintiff was referred to an ear, nose, and throat specialist regarding hearing and ear infections and was advised "on the importance of weight loss."  (Tr. 448.)

ARNP Shields examined Plaintiff in March 2012 during which Plaintiff reported having increased ear pain and fevers in the past two to three weeks.  (Tr. 453.)  ARNP Shields referred Plaintiff to an ear, nose, and throat specialist for his hearing problem and chronic otitis media.  (Tr. 454.)  In a follow-up examination in September 2012, Plaintiff reported that he had "no new complaints" and could not be seen for vocational rehabilitation because he "is in the process of filing for disability."  (Tr. 455.)  ARNP Shields recommended that Plaintiff continue his pain medications to treat his chronic ear pain and attempt to "self pay" in order to be seen by an ear, nose, and throat specialist.  (Tr. 456.)

In November 2012, Dr. Gisela Wagner, a treating physician, examined Plaintiff and noted that Plaintiff had not had frequent follow up cleanings since 2010, although he cleaned his ears

nightly.  (Tr. 436.)  Dr. Wagner found that Plaintiff had "dysfunction of Eustachian tube, chronic mastoiditis, and head trauma" and was taking pain medications.  (*Id.*)  Plaintiff complained of fevers, headaches, night sweats, earaches, difficulty swallowing and hearing, nausea, migraines, dizziness, and vertigo, but otherwise "denie[d] pain."  (Tr. 436–437.)  Dr. Wagner examined Plaintiff's left ear, removed wax, found "no obv[ious] infection" and recommended that Plaintiff follow up in four months for a cleaning.  (Tr. 438.)

In January 2014, Dr. Wagner examined Plaintiff for the first time since November 2012, during which Plaintiff reported that his ear felt wet and had an odor for about one month and that he experienced dizziness for about a month, but otherwise denied pain.  (Tr. 474.)  Dr. Wagner advised Plaintiff to make a follow-up appointment in six months.  (Tr. 475.)  Finally, in March 2014, Dr. Wagner examined Plaintiff due to Plaintiff's complaint of "ear swelling," indicating a possible infection.  (Tr. 476.)  Dr. Wagner examined and cleaned Plaintiff's left ear after noting wax build-up and some irritation under the build-up.   (Tr. 477.)   Dr. Wagner made recommendations to Plaintiff regarding future infections and noted that Plaintiff should return in six months for another cleaning.  (Tr. 478.)

At the hearing, Plaintiff testified that he has ongoing problems stemming from his ear surgeries, including ear discharge, ear infections, head pain, eye pain, neck pain, facial paralysis, headaches, and dizziness.  (Tr. 52–53.)  He testified that he treats his ear infections with antibiotics and treats his symptoms caused by his ear infections—dizziness, nausea, and headaches—with medication.  (Tr. 54–55.)  He testified that he has headaches three or four days a week, which he treats with medication.  (Tr. 55–56.)  As far as his daily activities, Plaintiff testified that his pain affects his sleep and his ability to attend to his personal hygiene (Tr. 57), although he is able to cook and do laundry.  (Tr. 57–58.)  Finally, Plaintiff testified about his work history, including, in

the 2000s, work as a security guard, a pizza delivery driver, and a "dub tech," which Plaintiff described as a position in which he copied media onto hard drives to enable editing.  (Tr. 32, 47–48, 234, 257.)

### 2.   The ALJ's Decision

In rendering the decision, the ALJ concluded that Plaintiff had not performed substantial gainful activity since June 25, 2009, the alleged disability onset date.  (Tr. 28.)  After conducting a hearing and reviewing the evidence of record, the ALJ determined that Plaintiff had the following severe impairments: chronic otitis media and obesity.  (Tr. 28.)  The ALJ reviewed the medical evidence regarding Plaintiff's hearing loss in his left ear, but determined that it was non-severe. (Tr. 29.)  Notwithstanding the noted impairments, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings").  (Tr. 29.)

The ALJ then concluded that Plaintiff retained a residual functional capacity ("RFC") to perform light work, with the following additional limitations: Plaintiff can occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds, and can occasionally be exposed to extreme temperatures, wetness, humidity, fumes, odors, gases, and hazards, such as machinery or heights.  (Tr. 29.)  In formulating Plaintiff's RFC, the ALJ considered Plaintiff's subjective complaints and determined that, although the evidence established the presence of underlying impairments that reasonably could be expected to produce the symptoms alleged, Plaintiff's statements as to the intensity, persistence, and limiting effects of his symptoms were not fully credible.  (Tr. 29–32.)

At the hearing, the ALJ asked the vocational expert ("VE") whether, given Plaintiff's RFC, Plaintiff could perform his past relevant work.  (Tr. 32, 59–60.)  The VE testified that Plaintiff

could perform his past relevant as a security guard, which the ALJ relied upon in determining that Plaintiff is not disabled.  (Tr. 32, 60.)

### APPLICABLE STANDARDS

To be entitled to benefits, a claimant must be disabled, meaning that the claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  *Id.* §§ 423(d)(3), 1382c(a)(3)(D).

The Social Security Administration, in order to regularize the adjudicative process, promulgated the detailed regulations currently in effect.  These regulations establish a "sequential evaluation process" to determine whether a claimant is disabled.  20 C.F.R. § 416.920.  If an individual is found disabled at any point in the sequential review, further inquiry is unnecessary. *Id.* § 416.920(a).  Under this process, the ALJ must determine, in sequence, the following:  (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment, i.e., one that significantly limits the ability to perform work-related functions; (3) whether the severe impairment meets or equals the medical criteria of a Listing; and, (4) whether the claimant can perform his or her past relevant work.  If the claimant cannot perform the tasks required of his or her prior work, step five of the evaluation requires the ALJ to decide if the claimant can do other work in the national economy in view of the claimant's age, education, and work experience.  *Id.* § 416.920(a).  A claimant is entitled to benefits only if unable to perform other work.  *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); 20 C.F.R. § 416.920(g).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

In reviewing the Commissioner's decision, the court may not decide the facts anew, re-weigh the evidence, or substitute its own judgment for that of the ALJ, even if it finds that the evidence preponderates against the ALJ's decision. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's failure to apply the correct law, or to give the reviewing court sufficient reasoning for determining that he or she has conducted the proper legal analysis, mandates reversal. *Keeton*, 21 F.3d at 1066. The scope of review is thus limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

## ANALYSIS

Plaintiff challenges the ALJ's decision on the following grounds: (1) the ALJ failed to fully and fairly develop the evidence, specifically the opinions of Dr. Taylor and Dr. Wagner and Plaintiff's testimony regarding his work history; (2) the ALJ erred by not finding his impairment of chronic mastoiditis to be severe; and (3) the ALJ erred by discrediting Plaintiff's pain testimony. (Dkt. 32 at 2.) For the reasons that follow, none of these contentions warrant reversal.

## A.    The ALJ's Development and Characterization of the Evidence

Plaintiff argues, in broad terms, that the ALJ failed to fully and fairly develop the record because the ALJ mischaracterized medical evidence and Plaintiff's testimony regarding his work history.  (Dkt. 32 at 11–19.)  First, Plaintiff argues that, although the ALJ gave great weight to the opinions of Dr. Taylor, the ALJ mischaracterized Dr. Taylor's records.  (Dkt. 32 at 11–13.)  Second, Plaintiff contends that the ALJ failed to specify the weight he afforded to Plaintiff's treating physician Dr. Wagner and "seemingly ignored" Dr. Wagner's reports, which, Plaintiff argues, prove he has a disability.  (Dkt. 32 at 13–18.)  Finally, Plaintiff argues that the ALJ mischaracterized his testimony regarding his work history.  (Dkt. 32 at 18–19.)

### 1.    The ALJ's Development of the Record

Plaintiff's broad contention that the ALJ failed to fully and fairly develop the record does not merit reversal because the transcript of the hearing shows that the ALJ did in fact fully and fairly develop the record.  "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record."  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *see* 20 C.F.R. § 416.912(d) ("Before [the Commissioner] make[s] a determination that [claimant is] not disabled, [the Commissioner] will develop [claimant's] complete medical history for at least the 12 months preceding" claimant's application).  However, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim."  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

When the claimant is not represented at the hearing before the ALJ, which is not the case here, the ALJ's "obligation to develop a full and fair record rises to a special duty . . . to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts and

to be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Graham*, 129 F.3d at 1423 (internal citations omitted).  In cases where the claimant was not represented at the hearing, "there must be a showing of prejudice" before remand is appropriate, which is found if "the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Id.* (internal citations omitted).  Examples of such prejudice are the ALJ's failure to obtain records, elicit testimony, or consider all record evidence.  *Brown v. Shalala*, 44 F.3d 931, 936 (11th Cir. 1995); *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985) (finding that prejudice "at least requires a showing that the ALJ did not have all of the relevant evidence before him in the record (which would include relevant testimony from claimant), or that the ALJ did not consider all of the evidence in the record in reaching his decision.").

Here, Plaintiff was represented by counsel at the hearing before the ALJ.  Thus, although the ALJ had a duty to develop the record, it was not the heighted duty required of an ALJ when the claimant is unrepresented. *Graham*, 129 F.3d at 1422.  Even looking to whether the Plaintiff has shown prejudice, which applies in cases where the claimant is unrepresented, Plaintiff cannot show prejudice requiring remand because the hearing transcript shows that the ALJ developed the record by thoroughly questioning Plaintiff about his symptoms, including headaches, nausea, and vertigo, and the way in which these symptoms affect his daily activities.  (Tr. 51–58.)  Also, at the hearing, the ALJ required that the record be supplemented with medical records regarding Plaintiff's headaches.  (Tr. 60).  Therefore, at the hearing, the ALJ elicited testimony from the Plaintiff to determine the ways in which his "symptoms affected [him]" and the ALJ instructed Plaintiff's counsel to supplement the record with all medical evidence supporting Plaintiff's claim. *See Graham*, 129 F.3d at 1423 (finding that prejudice was not shown because "the ALJ's questioning brought out all aspects of how [claimant's] symptoms affected her" and the ALJ

"questioned [claimant] about whether she had additional medical evidence to include").  Thus, Plaintiff's broad contention that the ALJ failed to adequately develop the record is not supported by the record and reversal is therefore unwarranted.

### 2.  Dr. Taylor

Second, Plaintiff argues that although the ALJ gave Dr. Taylor's opinions great weight (Tr. 31), the ALJ mischaracterized and ignored Dr. Taylor's findings regarding Plaintiff's symptoms and his need for routine cleanings and medical care for his left ear.  (Dkt. 32 at 11–13.)  Dr. Taylor examined Plaintiff in June 2009 and noted that Plaintiff has a history of surgeries and issues with his left ear and symptoms of dizziness, nausea, and pain.  (Tr. 383, 385.)  After examining Plaintiff, Dr. Taylor observed that Plaintiff's coordination, strength, movement in his extremities, gait, and range of motion were normal.  (Tr. 385–386.)  Despite Plaintiff's symptoms, Dr. Taylor concluded that Plaintiff lacks hearing in his left ear, although he has good hearing in his right ear, can lift and carry twenty pounds occasionally and ten pounds frequently, walk six hours out of an eight hour workday, climb, balance, crawl, and pull occasionally, has no limitations for sitting, does not need an assistive device, but should not do work requiring heights or climbing ladders, should only work occasionally on uneven terrain, and should avoid extreme temperatures or windy conditions.  (Tr. 386–387.)

Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of the claimant's impairments, including the claimant's symptoms, diagnosis, prognosis, ability to perform despite impairments, and physical or mental restrictions.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178–79 (11th Cir. 2011) (internal quotation and citation omitted).  When assessing the medical evidence,

the ALJ must state with particularity the weight afforded to different medical opinions and the reasons therefor.  *Id.* at 1179.

In determining the weight to afford a medical opinion, the ALJ considers the following factors: the examining and treatment relationship between the claimant and doctor, the length of the treatment and the frequency of the examination, the nature and extent of the treatment relationship, the supportability and consistency of the evidence, the specialization of the doctor, and other factors that tend to support or contradict the opinion.  *Hearn v. Comm'r, Soc. Sec. Admin.*, 619 F. App'x 892, 895 (11th Cir. 2015).  The ALJ must afford the opinion of a treating physician substantial or considerable weight unless "good cause" is shown to the contrary.  *Phillips v. Barnhart*, 357 F.3d 1232, 1240–41 (11th Cir. 2004).

Plaintiff first argues that the ALJ mischaracterized Dr. Taylor's findings because the ALJ allegedly introduced into Dr. Taylor's findings "the nonexistent language of 'a lack of clinical deficits upon examination.'"  (Dkt. 32 at 12.)  However, Plaintiff is referring to the ALJ's description of the August 2009 Physical RFC assessment prepared by Dr. K. Wu, not Dr. Taylor's findings. (Tr. 31–32.)  Therefore, Plaintiff's argument that the ALJ mischaracterized Dr. Taylor's findings is unsupported by the record.

Plaintiff next argues that the ALJ ignored Dr. Taylor's findings regarding Plaintiff's medical history, symptoms, and need for regular medical care. (Dkt. 32 at 11–12.)  The ALJ gave Dr. Taylor's opinions great weight because they were "based upon a thorough examination" and were supported by and consistent with Dr. Taylor's findings and the other record evidence.  (Tr. 31.)  Thus, the ALJ properly considered whether Dr. Taylor's opinions were consistent with her findings and were based on a physical examination.  *See Hearn*, 619 F. App'x at 895.

Upon review, the Court finds that the ALJ's affording Dr. Taylor's opinions great weight is supported by substantial evidence.  Dr. Taylor's opinions regarding Plaintiff's limitations are consistent with her findings regarding Plaintiff's symptoms arising from his ear condition.  Specifically, Dr. Taylor's assessment that Plaintiff is able to walk for six hours out of an eight hour work day, sit without limitation, and lift ten to twenty pounds is consistent with Dr. Taylor's findings that Plaintiff has a normal gait and strength.  (Tr. 384–387.)  Further, her findings as to Plaintiff's climbing and balance limitations and his need to avoid ladders, heights, extreme temperatures, and windy conditions take into account Plaintiff's symptoms of dizziness caused by his ear condition.  (Tr. 386–387.)  Accordingly, the ALJ was correct in according Dr. Taylor's opinions great weight because they were consistent with her findings as to Plaintiff's symptoms.  Therefore, Plaintiff's contention does not warrant reversal.

### 3.    Dr. Wagner

Third, Plaintiff argues that the ALJ erred by not stating the weight he afforded the opinions of treating physician Dr. Wagner and mischaracterizing Dr. Wagner's findings.  (Dkt. 32 at 13–18.)  Dr. Wagner examined Plaintiff in November 2012, during which Plaintiff complained of fevers, headaches, night sweats, earaches, difficulty swallowing and hearing, nausea, migraines, dizziness, and vertigo, but otherwise "denie[d] pain."  (Tr. 436–437.)  Dr. Wagner cleaned Plaintiff's ear, noting that there was no infection, and recommended that Plaintiff return in four months for a cleaning.  (Tr. 438.)  Dr. Wagner examined Plaintiff again in January 2014, during which Plaintiff was treated for an ear infection (Tr. 474–475), and again in March 2014, during which Plaintiff was treated for a possible ear infection and wax build-up.  (Tr. 477–478.)

As stated above, a treating physician's opinion is "given substantial or considerable weight unless good cause is shown to the contrary" and an ALJ must specify the weight given to the

treating physician's opinion. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). However, there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his or her decision, so long as the decision is not "a broad rejection" that leaves the court with insufficient information to determine whether the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005).

When an ALJ fails to state the weight accorded to a treating physician's opinion, this error is harmless if it does not "affect the administrative law judge's ultimate determination." *Hunter v. Comm'r of Soc. Sec.*, 609 F. App'x 555, 558 (11th Cir. 2015) (finding that the ALJ's decision was supported by substantial evidence and, therefore, the ALJ's failure to explicitly state the weight afforded to treating physicians' testimony was harmless error); *Tillman v. Comm'r, Soc. Sec. Admin.*, 559 F. App'x 975, 975–76 (11th Cir. 2014) (recognizing harmless error analysis in the context of an ALJ's failure to address a treating source's opinion and concluding that "when the ALJ's error did not affect its ultimate findings, the error is harmless, and the ALJ's decision will stand"); *Caldwell v. Barnhart*, 261 F. App'x 188, 191 (11th Cir. 2008) (finding that the ALJ's failure to state the weight given to a physician's opinions was harmless error because the opinions did not otherwise contradict the ALJ's findings); *Wright v. Barnhart*, 153 F. App'x 678, 684 (11th Cir. 2005) (finding harmless error for the ALJ's failure to explicitly state what weight he afforded to a number of physicians' medical opinions when the opinions did not directly contradict the ALJ's findings).

Here, the ALJ summarized Dr. Wagner's November 2012 assessment of Plaintiff in the ALJ's chronology of Plaintiff's treatment records and assessment of Plaintiff's RFC. (Tr. 31.) Specifically, the ALJ considered that Dr. Wagner found Plaintiff's hearing grossly intact and cleaned Plaintiff's left ear canal. (Tr. 31, 436–438.) Dr. Wagner's treatment records provide

observations from Plaintiff's examinations, record the procedures Dr. Wagner performed, namely cleaning his left ear, assess the condition of Plaintiff's ear, and provide Plaintiff with treatment recommendations, chiefly to continue routine cleanings by medical professionals and to attend to his ear on his own to prevent infections.  (Tr. 436–438, 474–475, 476–478.)

Although the ALJ did not specifically identify the weight he accorded Dr. Wagner's opinions, the ALJ summarized Dr. Wagner's treatment records in her chronology of Plaintiff's impairments and relied on Dr. Wagner's treatment notes to support her assessment of Plaintiff's RFC.  (Tr. 29–32.)  Thus, the ALJ's decision demonstrates that the ALJ properly considered Dr. Wagner's findings.   Further, Plaintiff does not specify if or how the ALJ's stating the weight he afforded Dr. Wagner's opinions would change the ALJ's ultimate findings.   Upon review, Dr. Wagner's treatment records show that Dr. Wagner recommended that Plaintiff's ear infections could be controlled by routine cleaning and do not reveal information that would "contradict the ALJ's findings." *Caldwell*, 261 F. App'x at 191.  Accordingly, the ALJ's error in not stating the weight she accorded to Dr. Wagner's opinion was harmless.

It must be noted, however, that Plaintiff is correct that the ALJ stated that Plaintiff "*returned* to Dr. Gisela Wagner on November 15, 2012," when in fact Plaintiff's first visit to Dr. Wagner was on November 15, 2012.  (Tr. 31, 436–438) (emphasis added.)  However, this factual error is harmless because the ALJ did not mischaracterize Dr. Wagner's treatment records and, therefore, the error did not affect the ALJ's conclusion.  *Vesy v. Astrue*, 353 F. App'x 219, 224 (11th Cir. 2009) (finding that the ALJ's factual error that claimant had not requested bathroom breaks during the hearing when in fact claimant had was harmless because it did not impact the ALJ's ultimate determination); *see Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (finding the ALJ's error regarding Plaintiff's age harmless).

4.      **Plaintiff's Work History**

Finally, Plaintiff contends that the ALJ mischaracterized Plaintiff's testimony regarding his work history.  (Dkt. 32 at 18–19.)  In evaluating a claimant's work experience, an ALJ considers the claimant's work performed within the last fifteen years that "lasted long enough for [claimant] to learn to do it, and was substantial gainful activity."  20 C.F.R. § 404.1565(a).  A claimant's work that was "'off-and-on' or for brief periods of time during the 15–year period" generally does not qualify as past relevant experience.  *Id.*

Plaintiff testified that in 2001 he worked as a security guard for nightclubs and restaurants for about a year and for roughly twenty-five hours per week, which required him to observe deliveries to ensure nothing was stolen.  (Tr. 47–49.)  Plaintiff then worked as a pizza delivery person for about a year.  (Tr. 49.)  Most recently, in 2007, Plaintiff worked as a "dub tech" for about six months.  (Tr. 49–51).  Plaintiff's testimony is confirmed by Plaintiff's reports, submitted as part of his disability application, regarding his work history, in which he reported that he worked in 2001 as a security guard, in 2002 delivering pizzas, and in 2007 as a "dub tech."  (Tr. 211–213, 234, 257.)  Thus, the ALJ's findings as to Plaintiff's work experience are consistent with Plaintiff's testimony and Plaintiff's reports regarding his work history.

Further, the ALJ employed the correct methods in evaluating Plaintiff's work experience because the ALJ questioned Plaintiff about his work history for the past fifteen years (Tr. 43–51) and did not consider Plaintiff's experience as a "dub" technician to be past relevant work because of its short duration.  (Tr. 32.)  *See* 20 C.F.R. § 404.1565(a).  Therefore, Plaintiff's contention does not warrant reversal because the record shows that the ALJ fairly characterized Plaintiff's testimony and made findings in accordance with Code of Federal Regulations, Title 20, Section 404.1565(a).

**B.      Step Two Severity of Impairments Analysis**

The ALJ concluded that Plaintiff has severe impairments of obesity and chronic otitis media.  (Tr. 28.)  Plaintiff contends that the ALJ erred at step two of the five-step analysis by not also finding his impairment of "chronic mastoiditis" to be severe.  (Dkt. 32 at 20–22.)

At step two of the evaluation process, the ALJ must consider the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  When considering the severity of the claimant's medical impairments, the ALJ must determine whether the impairments, alone or in combination, significantly limit the claimant's physical or mental ability to do basic work skills. *Phillips*, 357 at 1237 (citing 20 C.F.R. § 404.1520(c)).  In this step of the sequential process, the claimant bears the burden of proof that he or she suffers from a severe impairment or combination of impairments.  *Gibbs v. Barnhart*, 156 F. App'x 243, 246 (11th Cir. 2005).  An impairment is not severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).  "Basic work activities" include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404.1521(b)(1)–(6).

If an ALJ errs in finding that a claimant's *additional* impairments are non-severe, such error is harmless when the ALJ finds that a claimant has a severe impairment. *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 824–25 (11th Cir. 2010).  This is because the ALJ has determined that step two of the analysis is met and proceeds in the disability analysis. *Id.* ("Even if the ALJ

erred in not indicating whether chronic pain syndrome was a severe impairment, the error was harmless because the ALJ concluded that [claimant] had a severe impairment," which is all that is required at step two of the sequential analysis); *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014) ("Accordingly, even assuming that [claimant] is correct that her additional impairments were 'severe,' the ALJ's recognition of that as a fact would not, in any way, have changed the step-two analysis, and she cannot demonstrate error below."); *Burgin v. Comm'r of Soc. Sec.*, 420 F. App'x 901, 902–03 (11th Cir. 2011) ("Even assuming the ALJ erred when he concluded [claimant's] edema, sleep apnea, and obesity were not severe impairments, that error was harmless because the ALJ considered all of his impairments in combination at later steps in the evaluation process.").

The ALJ is, however, "required to consider all impairments, regardless of severity, in conjunction with one another in performing the *latter steps* of the sequential evaluation." *Tuggerson-Brown*, 572 F. App'x at 951 (emphasis added). The ALJ's failure to consider the combination of a claimant's impairments requires reversal. *Hudson v. Heckler*, 755 F.2d 781, 785 (11th Cir. 1985). As examples, an ALJ's statements that he considered whether claimant's impairment or combination of impairments met a Listing or that he considered all symptoms in determining claimant's RFC are sufficient "to demonstrate that the ALJ considered all necessary evidence." *Tuggerson-Brown*, 572 F. App'x at 951 (finding the ALJ's discussion of the combined effects of claimant's impairments sufficient because the ALJ discussed the non-severe impairments in the ALJ's assessment of claimant's RFC); *Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986) (emphasis in original) (quoting the ALJ and finding that it was "clear" that the ALJ considered claimant's impairments in combination because the ALJ stated that "'based upon a thorough consideration of all evidence, the ALJ concludes that appellant is not suffering

from any impairment, *or a combination of impairments* of sufficient severity to prevent him from engaging in any substantial gainful activity'").

In this case, at step two of the sequential evaluation process, the ALJ found that Plaintiff had severe impairments of obesity and chronic otitis media.  (Tr. 28.)  Thus, the ALJ found in Plaintiff's favor at step two and proceeded to the next steps of the sequential evaluation process to determine whether Plaintiff was disabled.  Because the ALJ found that Plaintiff had severe impairments and thus proceeded beyond step two, any error in failing to find that Plaintiff suffers from the *additional* severe impairment of chronic mastoiditis was harmless.  *Packer v. Comm'r, Soc. Sec. Admin.*, 542 F. App'x 890, 892 (11th Cir. 2013).

Further, the ALJ's findings at steps three and four of the sequential process demonstrate that the ALJ considered all of Plaintiff's impairments in combination.  At step three of the sequential process, the ALJ properly considered all of Plaintiff's relevant impairments and found that Plaintiff did not have an "impairment or combination of impairments" that met or equaled a Listing (Tr. 29), which is sufficient to show that the ALJ considered the combined effect of Plaintiff's impairments.  *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991); *Hutchinson v. Astrue*, 408 F. App'x 324, 327 (11th Cir. 2011).  Also, at step four of the sequential process, the ALJ considered the "entire record," including evidence relating to the Plaintiff's impairment and symptoms stemming from his ear surgeries, which encompasses chronic mastoiditis.  (Tr. 29–32.)  Specifically, the ALJ discussed that Plaintiff underwent a "left modified radical mastoidectomy" following his car accident at two years old.  (Tr. 30.)  The ALJ discussed Dr. Taylor's 2009 evaluation of Plaintiff, in which Dr. Taylor noted Plaintiff's history of ear surgeries stemming from his car accident and continuing problems with ear discharge, nausea, dizziness, pain, and infections.  (Tr. 30, 383.)  The ALJ also cited and discussed Plaintiff's

treatment history of routine cleanings of his ear canal at the USC Medical Center and the Brevard Health Alliance.  (Tr. 30, 403–408, 440–457.)

In sum, the ALJ sufficiently considered whether the combination of Plaintiff's impairments rendered Plaintiff disabled because the ALJ considered all of Plaintiff's impairments, severe and non-severe, at steps three and four of his analysis.  Further, because the ALJ, at step two of his analysis, found that Plaintiff has severe impairments, the ALJ's determination that Plaintiff's chronic mastoiditis is non-severe, even if erroneous, was harmless.  Accordingly, Plaintiff's second contention does not warrant reversal.

**C.      Credibility of Plaintiff's Pain Testimony**

Finally, Plaintiff contends that the ALJ erred by not adequately explaining her reasons for finding Plaintiff's pain testimony not entirely credible.  (Dkt. 32 at 22–24.)  The ALJ concluded that the evidence established that Plaintiff's ear impairment, chronic otitis media, reasonably could be expected to produce Plaintiff's symptoms of chronic pain, headaches, dizziness, and nausea, but that Plaintiff's testimony as to his symptoms' intensity, persistence, and limiting effects was not fully credible.  (Tr. 29–32.)  Upon review of the record, the Court finds that ALJ sufficiently articulated her reasons for finding Plaintiff's testimony not entirely credible because Plaintiff's testimony was inconsistent with his testimony regarding the frequency of his ear infections and his work history, objective medical evidence, and opinion evidence.  (Tr. 30–32.)

When determining whether a claimant is disabled, in addition to objective record evidence, the ALJ must consider the claimant's symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  20 C.F.R. § 404.1529.  To evaluate whether a claimant has established disability through the claimant's testimony of pain and other subjective symptoms, the ALJ must apply the following

test: first, whether there is evidence of an underlying medical condition and, second, whether there is objective medical evidence substantiating the severity of the pain from the condition or whether the medical condition is of sufficient severity that it would reasonably be expected to produce the pain alleged. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *see* 20 C.F.R. § 404.1529.

If an ALJ determines that the claimant's medical condition could reasonably be expected to produce the claimant's pain or other symptoms, the ALJ must then evaluate the intensity and persistence of the claimant's symptoms, including pain, to determine their effect on the claimant's capacity to work.   20 C.F.R. § 404.1529(c)(1); *Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772, 776-77 (11th Cir. 2010).   The ALJ considers all available evidence, including objective medical evidence, statements from the claimant, treating physicians, and non-treating physicians, and medical opinions. 20 C.F.R. § 404.1529(c)(1)–(2).   In addition to objective medical evidence, the ALJ considers other information claimant provides, such as (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant took to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; and (6) any measures the claimant personally used to relieve pain or other symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ evaluates a claimant's testimony against all other evidence and considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [claimant's] statements and the rest of the evidence." *Id.* § 404.1529(c)(4).   In sum, a claimant's symptoms, including pain "will be determined to diminish [claimant's] capacity for basic work activities to the extent that [claimant's] alleged functional limitations and

restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.*

An ALJ's determination of the credibility of a claimant's testimony regarding subjective pain is entitled to deference and a reviewing court will not disturb a clearly-articulated credibility finding with substantial supporting evidence in the record. *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). Thus, if an ALJ discredits a claimant's testimony, the ALJ must articulate, explicitly and adequately, reasons for not crediting the testimony. *Holt*, 921 F.2d at 1223–24. "Implicit in this rule is the requirement that such articulation of reasons . . . be supported by substantial evidence." *Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987); *Dyer*, 395 F.3d at 1212. If an ALJ fails to adequately explain the reasons for discrediting a claimant's testimony, the testimony must be accepted as true as a matter of law. *Hale*, 831 F.2d at 1012.

Therefore, as the reviewing Court, "[t]he question is not . . . whether ALJ could have reasonably credited [claimant's pain] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 938-39 (11th Cir. 2011) (finding that substantial evidence supported the ALJ's decision to discredit claimant's pain testimony because the testimony was inconsistent with claimant's testimony regarding his daily activities and with the records from his treating and examining physicians, showing claimant was capable of doing light work); *Dyer*, 395 F.3d at 1212 (reversing the district court's reversal of the ALJ's decision because "the district court improperly reweighed the evidence and failed to give substantial deference to the Commissioner's decision" to discredit claimant's pain testimony).

In this case, the ALJ sufficiently articulated reasons for discrediting Plaintiff's testimony regarding his symptoms' persistency, intensity, and limiting effects. The ALJ determined that Plaintiff's testimony about the persistence of his symptoms was undermined by his testimony that

he experiences only a "couple" of ear infections per year (Tr. 53) and evidence that Plaintiff's number of documented ear infections was minimal.  (Tr. 31.)  Further, the ALJ explained that Plaintiff's testimony regarding his work history (*see* discussion *supra* Section A), indicated that Plaintiff's "daily activities have been somewhat greater than" what Plaintiff alleges and that nothing in Plaintiff's treatment records have shown that the severity of his symptoms have increased between the time Plaintiff was working and Plaintiff's hearing before the ALJ.  (Tr. 31.)

As to opinion evidence, the ALJ relied on Dr. Taylor's 2009 assessment of Plaintiff's limitations.  (Tr. 30, 31.)  Dr. Taylor found that, despite Plaintiff's symptoms of dizziness, nausea, vertigo, and pain stemming from his left ear impairment, Plaintiff has no limitations concerning the amount of time he can be seated, does not need an assistive device in order to walk, was able to lift and carry twenty pounds occasionally and ten pounds frequently, walk six hours out of an eight hour workday, and occasionally climb, balance, crawl, and pull, but should not do work involving heights or climbing ladders, should work only occasionally on uneven terrain, and should avoid extreme temperatures or windy conditions.  (Tr. 386–387.)  Thus, the ALJ's decision to discredit Plaintiff's testimony about his symptoms is supported by Dr. Taylor's findings as to Plaintiff's capabilities.  Also, the ALJ gave great weight to the August 2009 physical RFC prepared by consulting physician Dr. Wu because it was consistent with the record, including Dr. Taylor's assessment of Plaintiff's limitations.  (Tr. 391–396.)

As to medical evidence, the ALJ explained that Plaintiff's testimony about his symptoms was further undermined by his USC Medical Center treatment records (Tr. 30) because these records show that, although Plaintiff has symptoms arising from his ear impairment, he was able to be treated with routine cleanings of his ear canal.  (Tr. 403–408.)  Also, the USC Medical Center treatment records show that, during the period of time when Plaintiff received these regular

cleanings, Plaintiff's vertigo was improving and the number of ear infections he had was decreasing.  (Tr. 405.)  Dr. Wagner likewise noted, in November 2012, that Plaintiff had not had frequent cleanings since 2010 despite the fact that he should have had cleanings every four months.  (Tr. 436.)  Finally, treatment notes by ARNP Shields show that Plaintiff received medications to treat his chronic pain and symptoms caused by his ear impairment.  (Tr. 456.)  As such, the ALJ's determination that Plaintiff's testimony and allegations regarding his pain and symptoms were not fully credible, and thus his symptoms did not rise to the level of disabling, was sufficiently articulated and supported by substantial record evidence.  *Dyer*, 395 F.3d at 1212.  Therefore, Plaintiff's final contention does not warrant reversal.

## CONCLUSION

Accordingly, after due consideration and for the foregoing reasons, it is

**ORDERED**:

1.      The decision of the Commissioner is **AFFIRMED**.

2.      The Clerk of Court is directed to enter final judgment in favor of the Commissioner and close the case.

**DONE** and **ORDERED** in Tampa, Florida on August 2, 2016.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record